Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| ASOCIACIÓN DE PROPIETARIOS PRADO ALTO EN TORRIMAR, INC.<br><br>Apelante<br><br>v.<br><br>MIBARI LAURA RIVERA SANFIORENZO<br><br>Apelada | KLAN202400603 | Apelación procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Sobre:<br>Cobro de Dinero Cuotas de Mantenimiento<br><br>Caso Núm.:<br>GB2022CV00303 |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Grana Martínez y el Juez Pérez Ocasio

Domínguez Irizarry, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de diciembre de 2024.

La parte apelante, Asociación de Propietarios de Prado Alto en Torrimar, Inc., comparece ante nos para que revoquemos la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala de Bayamón, el 10 de abril de 2024. Mediante la misma, el foro primario desestimó una demanda sobre cobro de dinero ordinario promovida en contra de la aquí apelada, señora Mibari Laura Rivera Sanfiorenzo.

Por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

**I**

El 31 de marzo de 2022, la parte apelante presentó la demanda de epígrafe. En la misma, alegó que la apelada era la titular de la unidad E-8 de la Urbanización Prado Alto en Guaynabo (Urbanización). Al respecto, sostuvo que, de conformidad con la certificación registral correspondiente, surgía que la apelada adquirió el derecho de dominio del referido inmueble mediante escritura de compraventa suscrita el 10 de agosto de 2002. A tenor

con sus afirmaciones, la parte apelante indicó que la apelada nunca le notificó la adquisición en controversia, ello dentro del plazo de treinta (30) días establecido en las disposiciones inherentes al control de acceso según lo regulado por el Código Municipal de Puerto Rico, Ley 107-2020, 21 LPRA sec. 7001 *et seq.* Al abundar, expuso que, con anterioridad a la referida compraventa, la propiedad en disputa se encontraba exenta del pago de cuotas de mantenimiento, "debido a que los antiguos titulares no autorizaron el establecimiento del sistema de control de acceso".[1]

En su demanda, la parte apelante expresó que, tras advenir al conocimiento de la compraventa por parte de la apelada, procedió a notificarle sobre su obligación de pago respecto a las cuotas de mantenimiento aplicables, ello conforme a las disposiciones de la Ley 107-2020, *supra,* y, por ende, a reclamarle las cantidades adeudadas. Sobre este particular, la entidad apelada indicó que, desde la fecha de la adquisición de la propiedad en cuestión, hasta enero de 2007, la cuota de mantenimiento ascendía a una suma de sesenta dólares ($60.00) mensuales, y, desde febrero de 2007 al presente, a setenta y cinco dólares ($75.00) mensuales. De este modo, y tras afirmar que los acuerdos transaccionales a los fines de amortizar la deuda acumulada resultaron infructuosos, la parte apelante solicitó al tribunal que condenara a la apelada al pago de $53,850.54 por el concepto en controversia, más una suma adicional por razón de gastos y honorarios de abogado.

El 20 de junio de 2022, la apelada presentó su *Contestación a Demanda.* En particular, negó las alegaciones de deuda que le fueron imputadas y sostuvo que, contrario a lo aducido por la parte apelante, esta conocía de su condición de titular de la unidad E-8 de la Urbanización desde el año 1984. En apoyo a dicha afirmación,

---

[1] Véase: Apéndice, Anejo 1, *Demanda,* pág. 2.

indicó que la parte apelante le remitía facturas a su nombre, así como que colocó rótulos públicos durante las remodelaciones del inmueble que exponían su carácter de titular, por lo que la entidad compareciente estaba impedida de no reconocerla dueña.

Entre sus defensas, la apelada expuso que, tal cual admitido por la parte apelante en la *Demanda*, su propiedad estaba exenta del pago de la cuota de mantenimiento por razón del acceso controlado de la Urbanización, toda vez que, ni ella, ni sus padres, aprobaron el mismo al momento de ser implementado en el lugar. Al amparo de ello, expresó que no podía catalogársele como deudora del concepto en controversia. Aun lo anterior, y sin que se entendiera como un reconocimiento de deuda retroactiva, informó que, desde enero de 2021, voluntariamente acordó aportar al pago de la cuota de mantenimiento en disputa. Así, y tras indicar que, de conformidad con las leyes aplicables a la controversia, imponerle el pago de las cuotas de mantenimiento reclamadas resultaba improcedente, la apelada solicitó que se desestimara la demanda de epígrafe.

Así las cosas, el 6 de febrero de 2023, la parte apelante presentó una *Moción de Sentencia Sumaria*[2] en la que, en esencia, afirmó que no existía controversia de hechos alguna en cuanto a que la apelada adquirió la residencia en disputa el 10 de agosto de 2002, mediante compraventa a los efectos. Expuso que, desde dicha fecha, a diciembre del año 2020, el inmueble había acumulado una deuda de $53,850.54 por concepto de cuotas de mantenimiento. De este modo, sostuvo que, dado a que la apelada se constituyó en adquiriente voluntaria del mismo, esta estaba obligada a saldar el

---

[2] La parte apelante acompañó su pliego con los siguientes documentos: 1) certificación de incorporación de la Asociación de Propietarios de la Urbanización Prado Alto en Torrimar, 2) copia de certificación registral con fecha del 23 de noviembre de 2020, relativa a la unidad E-8 de la Urbanización; 3) copia de facturas y estados de cuenta atinentes a la unidad E-8; 4) declaración jurada suscrita por la señora Seda Aponte, con fecha del 1 de febrero de 2020.

referido monto. Así, solicitó que se dictara sentencia sumaria de conformidad.

Por su parte, el 13 de marzo de 2023, la apelada presentó escrito en *Oposición a Moción de Sentencia Sumaria de la Parte y Solicitud de Sentencia Sumaria Favor de la Parte Demandada.* [3] En el pliego, reprodujo sus previas defensas y sostuvo que, desde el 9 de enero de 1985, era la propietaria de la unidad en controversia, en la cual, desde entonces, residía. Sostuvo su postura en cuanto a que la parte apelante tenía conocimiento de su condición de dueña, y se reafirmó en que, en calidad de ello, rechazó firmar la propuesta que, en el año 1988, la parte apelante le cursara a los efectos de asumir el pago de cuotas de mantenimiento por razón de la implantación del régimen de control de acceso en la Urbanización. La apelada indicó que activa y públicamente participó de asambleas y actividades convocadas por la parte apelante, que fue parte de un caso de naturaleza administrativa relacionado a una propuesta de desarrollo alterno de la Urbanización, así como que efectuó remodelaciones en su propiedad y recibió facturas por parte de la entidad compareciente, todo en calidad de dueña de la unidad E-8. A tenor con sus afirmaciones, expresó que todas las constancias de la parte apelante, podían acreditar que la propiedad en cuestión, desde su origen, le pertenecía a ella y no a un tercero, por lo que, proveer para la acción de cobro de epígrafe, en los términos requeridos por la parte apelante, constituiría un quehacer incorrecto y contrario al historial de facturación de la entidad. De este modo, la apelada se reafirmó en que la solicitud de sentencia sumaria promovida por la parte apelada era improcedente en derecho, por lo

---

[3] La apelada acompañó su escrito en oposición con la siguiente prueba documental: 1) declaración jurada suscrita por la apelada con fecha del 14 de marzo de 2023; 2) copia de extracto de deposición de la señora Seda Aponte; 3) copia de *Contrato de Mantenimiento* de la Urbanización; 4) copia de facturas de la unidad E-8 de la Urbanización; 5) copia de notificación de *Resolución* de ARPe dirigida a la apelada.

que solicitó al tribunal primario que denegara la misma y que, en contrario, dictara sentencia sumaria a su favor, desestimando la causa de autos.

El 18 de abril de 2023, la parte apelante presentó su escrito en oposición a la solicitud de sentencia sumaria de la apelada. En lo atinente, expuso que esta incidía al afirmar que su condición de propietaria de la unidad E-8 de la Urbanización, desde el año 1985, era un hecho incontrovertido que impedía la procedencia de las alegaciones de la demanda de epígrafe. Al abundar, indicó que los documentos registrales de la propiedad acreditaban que la misma fue originalmente adquirida por sus señores padres, quienes figuraron como titulares registrales de la unidad hasta que se produjo la compraventa entre estos y la apelada. Así, insistiendo en el hecho de que la apelada adquirió el inmueble a título voluntario en el año 2002, planteó que estaba obligada a satisfacer la deuda acumulada por concepto de las cuotas de mantenimiento aplicables desde dicha fecha. Por ello, sostuvo que, en estricto derecho, procedía que se dictara sentencia sumaria a su favor y, en consecuencia, que se denegara el petitorio de la apelada.

El 5 de mayo de 2023, el Tribunal de Primera Instancia emitió una *Resolución* en virtud de la cual declaró *No Ha Lugar* la solicitud de sentencia sumaria incoada por la parte apelante, así como la petición que, a tal fin sometiera la parte apelada. En específico, resolvió que ciertos aspectos subjetivos de credibilidad, así como varias controversias de hechos medulares, impedían la disposición sumaria del asunto. Específicamente, el foro primario señaló que existía una genuina disputa con relación a la fecha en la que se fundó la Asociación apelante, así como a si la comunicación mediante la cual la apelada notificó su negativa a consentir el establecimiento del control de acceso en la Urbanización, se efectuó en calidad de presunta dueña o a título representativo de sus

padres. Igualmente, el Tribunal de Primera Instancia dispuso que también existía controversia de hechos en cuanto a si los padres de la apelada efectivamente ejercieron el derecho a negarse al control de acceso, a si la parte apelante, desde su fundación, la reconoció como la titular de la unidad en disputa y si esta, en efecto, participaba, en calidad de dueña, de las actividades y reuniones convocadas por la parte apelada. De igual forma, el Tribunal de Primera Instancia señaló que también se hacía meritorio auscultar, con mayor rigor si, en su momento, las partes cumplieron con el proceso de otorgar la exención del pago de la cuota de mantenimiento por no consentir al acceso controlado de la Urbanización, si dicha exención se emitió a favor de la apelada o de sus padres, si esta presentó prueba fehaciente de su alegada titularidad y si las facturas cursadas por la parte apelante, desde el año 1988 al 2007, iban dirigidas a la apelada. Así, y tras reafirmarse en la necesidad de celebrar un juicio en su fondo para dirimir las controversias identificadas, el tribunal primario proveyó para la continuación del trámite ordinario del asunto.

Tras varias incidencias, el 6 de febrero de 2024, dio inicio el juicio en su fondo. En apoyo a su postura, la parte apelada presentó en evidencia el testimonio de la señora Sandra Seda Aponte, Administradora de la Urbanización desde el año 2008, así como el de la señora Marisel Castillo Guzmán, Contable de la parte apelada desde el año 2007. Por su parte, la apelada presentó en evidencia su declaración. Las partes estipularon la escritura de compraventa otorgada el 10 de agosto de 2002, en virtud de la cual la apelada adquirió de sus padres la residencia. Igualmente, conforme surge, el Tribunal de Primera Instancia admitió en evidencia la siguiente prueba documental por parte de la entidad apelante: 1) Exhibit 1: Certificación del Departamento de Estado de la Asociación de Propietarios Prado Alto en Torrimar, Inc.; 1) Exhibit 2: Certificación

Registral de la propiedad E-8 , Calle 1, de la Urbanización, con fecha del 24 de noviembre de 2020; 3) Exhibit 3: Facturas de la Urbanización relacionadas a la unidad E-8; 4) Exhibit 4: Declaración Jurada suscrita por la señora Seda Aponte, dando fe de la deuda reclamada; 5) Exhibit 5: estado de cuenta de la unidad E-8 emitida por la contable Castillo Guzmán, con fecha del 11 de diciembre de 2020.   A su vez, el foro sentenciador admitió en evidencia la siguiente prueba documental, según presentada por la apelada: 1) Exhibit 1: facturas de la Urbanización remitidas a la apelada para el periodo comprendido desde el año 2008 al 2020; 2) Exhibit 2: copia de Propuesta de Contrato de Mantenimiento; 3) Exhibit 3: carta suscrita por la apelada con fecha del 31 de agosto de 1988; 4) Exhibit 4: copia de Resolución de ARPe y su notificación; 5) Exhibit 5: rótulo de remodelación de la unidad E-8, identificando a la apelada como dueña de la propiedad; 6) Exhibit 6-A: copia de carta suscrita por la apelada con fecha del 11 de enero de 2021; 7) Exhibit 6-B: copia de carta suscrita por la apelada con fecha del 28 de enero de 2021.

La primera testigo en declarar lo fue la señora Seda Aponte, Administradora de la Urbanización desde el año 2008. En particular, tras expresarse sobre sus funciones y sobre la certificación de incorporación de la Asociación apelante, afirmó conocer a la apelada, quien, sostuvo, residía en la unidad E-8 del lugar.  Indicó que, en el año 1986, se estableció el régimen de control de acceso en la Urbanización, ello tras consultar a los titulares en ese entonces, todo con posterioridad a la primera venta efectuada en la Urbanización.  Al abundar, expresó que, respecto a la implantación del régimen de control de acceso, varios residentes aceptaron y otros se opusieron.  Al ser inquirida, indicó que, aquellos que prestaron su oposición, quedaban exentos del pago de la cuota de mantenimiento, por lo que recibirían facturas en cero.

En cuanto a este particular, la testigo afirmó que la unidad E-8 fue una cuyos residentes se opusieron al control de acceso. Al inquirírsele sobre ello, indicó que los padres de la apelada eran los titulares originales de la referida propiedad. Ante dicha afirmación, la testigo fue confrontada con la escritura de compraventa suscrita entre la apelada y sus señores padres el 10 de agosto de 2002, quienes, hasta entonces, figuraban como los titulares registrales del inmueble. Tras identificar a los comparecientes en la referida escritura, la testigo Seda Aponte expresó que advino al conocimiento de que la apelada adquirió de sus padres la unidad E-8, cuando recibió un correo electrónico sobre una petición de certificación de deuda en el año 2019 por parte de una institución bancaria. Al continuar con su declaración, indicó que remitió dicho trámite a la Junta de Directores y al abogado de la Urbanización, toda vez que nunca había efectuado uno de dicha naturaleza, más aun tratándose de unos residentes opositores al cierre del lugar. A su vez, al ser inquirida sobre quién efectuó la solicitud antes indicada, sostuvo que fue "un banco hipotecario representando a la residente de la E-8"[4], a quien identificó como tal a la aquí apelada. No obstante, se reafirmó en que, a base de su conocimiento, los titulares de la propiedad en disputa eran sus padres. La testigo fue confrontada con una certificación registral expedida en cuanto a la unidad E-8 de la Urbanización, documento que fue admitido en evidencia, el cual afirmó haber visto en noviembre de 2020, luego de recibirlo mediante correo electrónico. Al expresarse sobre su contenido, indicó que del mismo surgía la apelada como la titular registral del inmueble, quien lo adquirió, por compraventa, por un valor de $100,000.00, el 10 de agosto de 2002.

---

[4] Véase: *Transcripción de Vista,* pág. 46.

La señora Seda Aponte expresó que, una vez supo de la condición de titular registral de la apelada, procedió a enviarle los estados de cuenta de su unidad, por razón de que, desde que adquirió la misma, estaba obligada a pagar la cuota de mantenimiento de la Urbanización. A raíz de dicha afirmación, la testigo fue confrontada con dos (2) estados de cuenta, los cuales fueron admitidos en evidencia. Sobre los mismos, indicó que fueron emitidos en marzo de 2022. Al abundar, expresó que uno de ellos contenía un cálculo de las cuotas de mantenimiento al descubierto desde el año 2002 al 2022, y afirmó que los mismos se le remitieron a la apelada a través del Oficial de Seguridad de la Urbanización, quien lo colocó en el buzón de su residencia. Al ser inquirida sobre el total de las facturas, la testigo Seda Aponte expresó que uno trataba de un total de $54,912.79 y, el otro, de $1,102.22. Al requerírsele aclarar la razón por la cual se remitieron dos facturas a la apelada, la testigo indicó que una de ellas atendía la deuda acumulada desde la adquisición del inmueble hasta diciembre de 2021 y, la otra, la correspondiente al periodo comprendido entre enero a marzo de 2022, más cargos recurrentes de $75.00. La testigo Seda Aponte fue confrontada con una declaración jurada por ella suscrita el 1 de febrero de 2023, pliego debidamente admitido en evidencia. Al ser inquirida sobre su contenido, testificó que, en el mismo, dio fe de que, hasta el mes de diciembre de 2020, la apelada adeudaba una cantidad de $53,850.54 por concepto de cuotas de mantenimiento.

La testigo Seda Aponte fue contrainterrogada por la representación legal de la apelada. En particular, indicó que su contratación como Administradora en la Urbanización se produjo en el año 2008. Al ser inquirida sobre su gestión al advenir a dicho cargo, la testigo admitió que nunca recibió expediente alguno de años anteriores referente a los trámites en la Urbanización. A tenor

con ello, reconoció desconocer si en el algún registro anterior constaba que la apelada era la titular de la propiedad en controversia. Al proseguir, indicó que la Contable de la Urbanización era la encargada de enviar las facturas de cobro de cuota de mantenimiento de la Urbanización y, específicamente expresó que las mismas se remitían a nombre de los residentes de las unidades que la componen, según un listado oficial de residentes que se le provee a la Contable. Al preguntársele sobre dicho listado, la testigo indicó desconocer quién hace entrega del mismo, más admitió que, respecto a la unidad E-8, la facturación correspondiente siempre se ha hecho a nombre de la aquí apelada.[5] En este contexto, la testigo también admitió que no existía récord alguno en el que se hiciera constar a una persona distinta a la apelante como el titular de la unidad E-8.

En su contrainterrogatorio, la testigo expresó que, si bien no realiza las facturas de cobro de cuotas, era la encargada de recibirlas y de entregarlas a los oficiales de seguridad para que se repartieran entre los residentes.  Al abundar, reconoció que veía los balances computados en las mismas y afirmó que, en cuanto a la E-8, estos siempre estaban en cero. No obstante, aclaró que desconocía sobre las facturas emitidas antes del año 2007, más se reafirmó en que, desde el año 2008, todas las facturas mensuales de la unidad en cuestión se emitían a nombre de la apelada, con un balance en cero. Ahora bien, la testigo indicó desconocer el balance dentro del periodo comprendido entre el 2008 y el 2020. A su vez, se reafirmó en que no existía algún documento o factura en el que se identificara a otra persona como titular de la E-8. La testigo fue confrontada con nueve estados de cuenta correspondientes al periodo comprendido entre el 2008 y el 2019, los cuales fueron debidamente admitidos en

---

[5] *Íd.*, pág. 98.

evidencia. Al respecto, afirmó que se trataba de los documentos que la Contable de la Urbanización le entregaba para que fueran posteriormente repartidos entre los titulares de las residencias para propósito de cobro.

Sobre las antedichas facturas, la testigo reconoció que estaban dirigidas a la apelada y que el balance reflejado en las mismas era de cero. Al inquirírsele en cuanto a dicho particular, la testigo indicó que no sabía la razón por la cual las mismas reflejaban un balance en cero, ello por razón de que no estaba a cargo de realizar los cómputos de los cobros aplicables. A tenor con ello, también indicó desconocer cómo se llegó al total de las facturas de $54,912.79 y de $1,102.22, previamente admitidas como prueba de la parte apelada. En ese mismo sentido, al preguntársele sobre el contenido de la declaración jurada que suscribió dando fe de la deuda reclamada a la apelada por los referidos montos, la testigo Seda Aponte reconoció desconocer la procedencia de dichos números. A su vez, en el contexto del contenido de su declaración jurada, la testigo admitió que, contrario a lo que allí atestiguó, en referencia a haber examinado unos expedientes que acreditaban la alegada deuda, ello no ocurrió por no existir récord alguno. Así, admitió que la declaración jurada de referencia se la prepararon, y que solo se limitó a firmarla.

La segunda testigo en declarar a favor de la teoría de la parte apelada, lo fue la Contable de la Urbanización, la señora Castillo Guzmán. En específico, indicó que proveía servicios de contabilidad a la Urbanización desde, aproximadamente, el año 2007 y que, entre sus funciones figuraban recibir pagos, sacar facturaciones, hacer reportes de *balance sheet*, hacer relación de gastos y hacer la relación de ganancias y pérdidas. A su vez, indicó que también estaba a cargo de preparar los estados de cuenta de las propiedades de la Urbanización, ello mediante el empleo de un programa

electrónico, *QuikBook,* que contiene la información de todas las casas, incluyendo deudas y créditos. Al proseguir con su declaración, la testigo Castillo Guzmán indicó que, durante el periodo entre el año 2008 y el 2021, imprimía los estados de cuenta de las residencias, y los llevaba a la caseta de los oficiales de seguridad para que fueran repartidos. Al abundar, indicó que la Administradora en funciones al momento de su contratación, le proveyó el acceso a la antedicha plataforma digital, la cual contenía los balances iniciales de las propiedades, así como el historial de la Urbanización.

En su testimonio, la testigo Castillo Guzmán afirmó conocer las residencias que no pagaban cuota de mantenimiento por haberse opuesto al control de acceso de la Urbanización. Al ser inquirida sobre la unidad E-8, la testigo declaró esta era una de las propiedades exenta del pago en cuestión.  Añadió que, en el año 2020, la testigo Seda Arroyo, en calidad de Administradora, la llamó para indicarle que la Junta de Directores de la Urbanización se había reunido y que decidieron hacer una investigación de la referida propiedad, toda vez que entendía que la misma debía ser facturada y sujeta al pago de la cuota de mantenimiento.  Al abundar, indicó que, en virtud de ello se le solicitó que efectuara una factura computando el pago aplicable desde el año 2002 al año 2020. La testigo fue confrontada con un documento de diez páginas, que contenía una relación de cuotas de mantenimiento por mes y de los cargos por demora establecidos, el cual fue admitido en evidencia.  Sobre el mismo, indicó haberlo preparado con fecha del 11 de diciembre de 2020 y expresó que del mismo surgía un balance al descubierto de $53,854.00.

La testigo Castillo Guzmán fue confrontada con los dos (2) estados de cuenta previamente admitidos en evidencia, emitidos por las sumas de $1,102.72 y $54,912.79, ello en cuanto a la unidad E-

8 de la Urbanización. Sobre los mismos, afirmó haberlos preparado e indicó que las cantidades reflejadas contenían el recargo aplicable según establecido en el programa digital empleado.

Al ser contrainterrogada, la testigo Castillo Guzmán nuevamente afirmó que, desde el año 2007, es la persona encargada de efectuar los estados de cuenta en la Urbanización. A preguntas sobre las facturas de la unidad E-8, la testigo afirmó que, desde dicho año, todas reflejaban un balance de cero deuda. Confirmó, por igual, que, para propósitos de la entrega de las facturas de cobro, las llevaba a los oficiales de seguridad para que dieran curso a dicha gestión respecto a los dueños de las casas. A su vez, al ser inquirida sobre la persona a la cual se dirigieron las facturas de la E-8 para los años comprendidos entre el 2007 y el 2020, la testigo afirmó que todas se emitieron en cuanto a la aquí apelada y que a esta le eran entregados. La testigo fue nuevamente confrontada con los estados de cuenta de la unidad E-8 previamente admitidos en evidencia, y reconoció que los mismos hacían alusión a unas facturas que no existían. A su vez, nuevamente se le mostraron los estados de cuenta que respectivamente reflejaban las sumas de "1,102.72 y $54,912.79 y, en cuanto a estas, aceptó que indicaban un *Balance Forward* de cero deuda.

Iniciado el turno de prueba de la apelada, esta fue llamada a declarar. La apelada afirmó residir en la unidad E-8 de la Urbanización desde que compró la misma en el año 1985. Al abundar sobre las circunstancias en las que se produjo la antedicha adquisición, la apelada expresó que, en ese momento, era estudiante universitaria y que, como no cualificaba para efectuar la compra del inmueble, su padre prestó su firma para que pudiera tener la unidad. Al proseguir, expresó que comenzó a residir en la propiedad en ese mismo año y que, a dicho momento, no existía el régimen de control de acceso en la Urbanización. Sobre dicho particular, indicó

que, en su mejor recuerdo, el control de acceso se instituyó en el año 1989, cuando era estudiante de derecho.

En su declaración, la apelada sostuvo que, para dicha fecha, un representante de la entonces Asociación de Propietarios de la Urbanización, le entregó una propuesta de contrato de mantenimiento relacionado al control de acceso. Al abundar, afirmó que el mismo le fue entregado por razón de ser la dueña de la casa. Tras autenticar el referido documento, el mismo fue admitido en evidencia. Sobre el pliego, expresó que lo tenía en sus archivos y, al declarar sobre su contenido, indicó que en el documento se le solicitaba consentir, o no consentir, al cierre de la Urbanización. Según declaró, en la propuesta en cuestión, se hizo constar una suma de $40 mensuales por concepto de cuota de mantenimiento. Sin embargo, afirmó que denegó firmar la propuesta cursada. Al inquirírsele sobre la forma en la que denegó consentir a la propuesta, la apelada expresó que, en el año 1988, junto a su entonces señor esposo, firmó un documento dirigido a la Asociación de Propietarios, exponiendo su oposición al cierre, así como negándose al pago de la cuota establecida. Sobre dicho documento, la apelada indicó que se trató de una misiva que redactó y que dirigió a los entonces miembros de la Asociación. Luego de autenticar el referido pliego, fechado del 31 de agosto de 1988, el mismo se admitió en evidencia. Al abundar sobre su contenido, la apelada indicó que, en la propuesta cursada por la Asociación, fue identificada como residente de la propiedad en controversia y que contestó la misma en calidad de dueña.

La apelada indicó que, en el año 1992, los dueños de las propiedades de la calle E de la Urbanización, comparecieron ante ARPe para solicitar que se les vendieran los terrenos baldíos contiguos a sus predios. Al respecto, se reafirmó en que compareció en calidad de dueña e indicó que el proceso administrativo les

resultó adverso. Al continuar, sostuvo que podía dar fe de ello, dado a haber recibido la *Resolución* emitida por la agencia. Abundó, que el dictamen correspondiente se le remitió como titular de una de las propiedades solicitantes y que participó activamente en las vistas del proceso. La apelada fue confrontada con el dictamen antes aludido, documento que, tras autenticarse, se admitió en evidencia. Al abundar sobre su contenido, indicó que surgía que había sido dirigido a su persona, que aparecía como una de las proponentes de la solicitud administrativa, y que la misma versaba sobre el consenso de los propietarios de la calle E para adquirir los predios contiguos a sus inmuebles. De igual modo, expresó que, entre los participantes, figuró un miembro de la Junta de Directores de la Asociación regente en ese entonces.

Como parte de su testimonio, la apelada indicó que, en el año 2004, remodeló su propiedad al construir una cocina. Sobre ello, abundó que fue preciso demoler y remover escombros por un término de aproximadamente un (1) año. Al preguntársele sobre si hubo alguna interacción con algún miembro de la Administración de la Urbanización, la apelada declaró que estos estaban pendiente de los trabajos en su casa, incluyendo una de sus vecinas inmediatas, quien fungía como Presidenta de la Junta.

La apelada declaró que, el año 2015, solicitó un permiso de construcción al Municipio de Guaynabo para arreglar la piscina de su residencia y remodelar unos baños. Sobre dicho trámite, indicó que, una vez les expidieron el permiso de construcción, colocó un letrero que daba publicidad a la autorización para los trabajos. La testigo fue confrontada con una fotografía. Sobre la misma, indicó que se trataba de una que tomó en el año 2015, por lo que, tras autenticarla, la misma se admitió en evidencia. Al ser inquirida sobre el contenido de la imagen, declaró que se trataba de la foto del rótulo aludido. A preguntas sobre quién aparecía mencionada como

el dueño de la propiedad, afirmó que se trataba de ella. Añadió que el proyecto de construcción duró poco más de un año, y sostuvo que la testigo Seda Aponte acudió varias veces a su residencia a verificar las incidencias del trabajo y a dialogar con los constructores. La apelada expresó que el letrero antes aludido estaba en un lugar visible.

La apelada aclaró que participaba activamente de todas las actividades de la Urbanización y que comparecía a las asambleas como propietaria de la unidad en disputa. Sobre ello, afirmó que, desde el año 1985, compareció a las asambleas, y que nunca se cuestionó su participación en calidad de dueña.

Al testificar sobre el cobro de las cuotas objeto de litigio, la apelada afirmó que estaba exenta de dicha obligación. Indicó, que comenzó a recibir facturas desde el año 2006, todas expresamente dirigidas a su nombre y que, hasta diciembre del año 2020, las facturas en cuestión reflejaban cero de deuda.

A la apelada se le mostró la escritura de compraventa otorgada entre ella y sus padres en el año 2002, documento que fue estipulado por los comparecientes y, en consecuencia, marcado como evidencia. Al hablar sobre su contenido, expresó que allí surgía que comparecía en calidad de compradora. Al requerírsele explicar dicha incidencia, sostuvo que, para ese año, ya contaba con un mejor trabajo, y que sus padres querían formalizar la ayuda que en su momento le brindaron para adquirir la propiedad E-8. Indicó, que de la escritura surgía un precio de compraventa de $100,000.00 y a una suma anterior de $76,205.72. Sobre ello, expresó que ella satisfizo esta última cantidad mediante el pago de la hipoteca del inmueble, todo porque era su obligación principal como dueña de la casa desde su adquisición.

Sobre el cobro de la deuda en controversia, la apelada expresó que, en enero de 2021, recibió una factura de cobro por,

aproximadamente, $53,000.00. En cuanto a la misma, indicó que se comunicó por escrito con la parte apelada para dialogar sobre el asunto, ya que la factura no contenía una relación detallada que explicara la procedencia de la deuda que se le reclamó. La apelada fue confrontada con la carta que remitió el 11 de enero de 2021 a la parte apelante al recibir la factura en disputa. Tras autenticarla, la misma fue admitida en evidencia. A su vez, también se le mostró una carta con fecha del 28 de enero de 2021, dirigida al licenciado Johnny Correa, la cual también se admitió en evidencia. Sobre esta, la apelada declaró que solicitó al licenciado que evidenciara la forma en la que computaron la cantidad que se le reclamó, puesto que siempre recibió facturas en cero. No obstante, afirmó recordar no haber recibido la evidencia requerida. La apelada concluyó su interrogatorio afirmando que todos los miembros de la parte apelante conocían que, desde el año 1985, ella era la titular de la propiedad.

Al ser contrainterrogada, la apelada sostuvo que tenía cartas de su señora madre que acreditaban su condición de dueña de la unidad E-8 desde el año 1985. Sobre ello, reconoció no tener escrituras, salvo la otorgada en el año 2002. La apelada admitió que, hasta dicha fecha, los titulares registrales del inmueble fueron sus padres. Igualmente, reconoció que, en el año 2002, no notificó a la Junta de la Urbanización sobre la transacción en controversia. A su vez, sobre la propuesta de cuota de mantenimiento, se reiteró en que nunca firmó el consentimiento para el cierre de la Urbanización. La apelada fue enfática en que siempre ejerció las facultades de dueña, que desde el 1985 la residencia en disputa le pertenecía y que, desde el inicio de la adquisición, fue quien pagó la casa hasta su final saldo.

Tras aquilatar toda la evidencia sometida a su consideración, el 10 de abril de 2024, el Tribunal de Primera Instancia notificó la

*Sentencia* aquí apelada. Mediante la misma, dispuso que, en el año 1989, cuando se implantó el sistema de control de acceso en la Urbanización, la Asociación regente en dicho entonces le cursó a la apelada una propuesta de contrato para cuotas de mantenimiento aplicables, ello por constarle que esta era la dueña de la unidad E-8. El tribunal primario concluyó que la apelada, en calidad tal, notificó por escrito su oposición, por lo que nunca le revistió obligación alguna de pago por dicho concepto.  A su vez, en su dictamen, el foro de origen concluyó que, desde su fundación, la parte aquí apelante reconoció a la apelada como dueña del inmueble, que, como tal, toda factura se emitía a su nombre, así como que esta participaba activamente en las actividades de la Urbanización, sin recibir objeción alguna por parte de la entidad compareciente. De este modo, el Tribunal de Primera Instancia dispuso que no procedía la acción de cobro de dinero por concepto de cuotas de mantenimiento adeudadas en contra de la apelada.

Inconforme, y tras denegada una previa solicitud de reconsideración, el 20 de junio de 2024, la parte apelante compareció ante nos mediate el presente recurso de apelación.  En el mismo formula los siguientes señalamientos:

> Erró el TPI al determinar que la apelada demandada era dueña de la propiedad E-8 de Prado Alto desde el año 1985.
>
> Erró el TPI al no determinar que la apelada demandada adquirió la titularidad en el año 2002 de la propiedad E-8 mediante escritura de compraventa.
>
> Erró el TPI al determinar que la apelada demandada tenía el derecho a oponerse a la instalación del control de acceso al declararla opositora.
>
> Erró el TPI al determinar que la apelada demandada no era una adquiriente voluntaria desde el año 2002.
>
> Erró el TPI al determinar que la apelada demandada no tenía la obligación de pagar las cuotas de mantenimiento luego de haber adquirido la propiedad en el año 2002, a pesar de que el control de acceso ya había sido constituido en el 1989.

**II**

**A**

"[L]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada [...]". *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778 (2022); *Gómez Márquez et al. v. El Oriental,* 203 DPR 783, 792 (2020), citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). De ahí que las determinaciones de credibilidad que realiza el tribunal primario están revestidas de una presunción de corrección, razón por la cual, en este aspecto, gozan de un amplio margen de deferencia por parte del foro intermedio. *Dávila Nieves v. Meléndez Marín,* supra. Asimismo, como norma, un tribunal apelativo está impedido de sustituir o descartar, por sus propias apreciaciones, las determinaciones de hechos que realiza el foro sentenciador, fundamentando su proceder en un examen del expediente sometido a su escrutinio. *Íd.*

De ordinario, el Tribunal de Primera Instancia es quien está en mejor posición para aquilatar la prueba testifical que ante sí se presentare, puesto que es quien oye y observa declarar a los testigos. *Barreto Nieves et al v. East Coast,* 2024 TSPR 40, 213 DPR ___ (2024); *Ortiz Ortiz v. Medtronic,* supra, págs. 778-779; *Gómez Márquez et al. v. El Oriental,* supra, pág. 792; *López v. Dr. Cañizares,* 163 DPR 119, 136 (2004). En este contexto, el juzgador de hechos goza de preeminencia al poder apreciar sus gestos, contradicciones, manierismos, dudas y vacilaciones, oportunidad que le permite formar en su conciencia la convicción de si dicen, o no, la verdad.

Ahora bien, la normativa antes expuesta no es de carácter absoluto. Si bien el arbitrio del foro primario es respetable, sus dictámenes están sujetos a que los mismos se emitan conforme a los principios de legalidad y justicia. *Méndez v. Morales,* 142 DPR 26, 36 (1996). Al amparo de ello, el ordenamiento jurídico vigente

dicta que el criterio de deferencia antes aludido cede, entre otras instancias, cuando se determina que el juzgador de hechos incurrió en pasión, prejuicio, parcialidad o error manifiesto. *Barreto Nieves et al v. East Coast,* supra; *Gómez Márquez et al. v. El Oriental,* supra, pág. 793.

**B**

Por su parte, la Ley de Control de Tráfico en Áreas Residenciales, Ley Núm. 21 de 20 de mayo de 1987, 23 LPRA sec. 64 *et seq,* [6], insertó en nuestro esquema estatutario el interés estatal de mejorar la seguridad y tranquilidad de las comunidades, así como de propender a una mejor convivencia e interacción entre los miembros que las componen. *Residentes Sagrado Corazón v. Arsuaga,* 160 DPR 289, 300 (2003). Mediante su aprobación, el legislador facultó a los municipios para expedir los correspondientes permisos para el control del tráfico de vehículos de motor y el uso público de las calles en urbanizaciones y comunidades residenciales públicas o privadas, con un solo acceso de entrada y salida, o con más de uno, siempre que ninguna de sus vías públicas sirva de entrada o salida a otra calle, urbanización o comunidad que no haya solicitado el control de acceso. 23 LPRA sec. 64.

A fin de poder presentar un permiso para establecer la limitación en cuestión y, como resultado, poder obtenerlo, la ya derogada Ley Núm. 21, *supra*, expresamente exigía el cumplimiento de determinados requisitos para legitimar la gestión correspondiente. En lo concerniente, el estatuto disponía que las urbanizaciones que habrán de quedar afectas a la referida carga, debían contar un consejo, junta o asociación de residentes debidamente organizada y registrada en el Departamento de Estado

---

[6] La Ley Núm. 21, *supra,* fue derogada por las disposiciones del Código Municipal de Puerto Rico, Ley 107-2020, 21 LPRA sec. 7001 *et seq.* No obstante, haremos alusión a sus términos, por ser el estatuto vigente al momento de los hechos en los que se funda la controversia de autos.

como una institución sin fines de lucro. 23 LPRA sec. 64a (a). Por igual, se requería que la correspondiente petición fuese adoptada por, al menos, tres cuartas (¾) partes de los propietarios de las viviendas establecidas en el lugar de que trate, así como, el efectivo compromiso de la comunidad en cuanto a asumir los gastos de instalación, operación y mantenimiento de las facilidades que propicien el control de acceso solicitado. 23 LPRA sec. 64a (c) y (d).

Por su parte, y en la consecución de lo anterior, Ley Núm. 21, *supra*, arrogaba autoridad a las asociaciones de residentes para administrar los sistemas de control de acceso debidamente establecidos, mediante la implantación de una cuota para cubrir los costos y gastos pertinentes. 23 LPRA sec. 64d-3 (a). El estatuto en cuestión expresamente establecía quiénes eran las personas obligadas a pagar una cuota de mantenimiento de control de acceso en una comunidad o urbanización, a saber:

. . . . . . . .

(1) Los propietarios de fincas en las que se haya inscrito la autorización o permiso bajo el procedimiento establecido en la sec. 64d-1 de este título.

(2) Los propietarios que autorizaron la solicitud para establecer el control de acceso, según fue implantado.

(3) Todo propietario adquirente de una finca, ubicada en una misma urbanización, calle o comunidad que ha sido autorizada por el municipio correspondiente para controlar el acceso o que, a la fecha de la compraventa, se encontrara en trámite de obtener el consentimiento de tres cuartas (¾) partes de los propietarios y así conste en actas.

(4) Cuando la solicitud fue hecha por el urbanizador, desarrollador o constructor, el pago de cuota será obligatorio para toda persona que advenga dueño del inmueble.

(5) Los propietarios que no autorizaron expresamente el establecimiento del sistema de control, de acceso, pero que en fecha posterior se comprometieron al pago mediante contrato escrito.

[...].

23 LPRA. sec. 64d-3 (a).

22

Por su parte, la Sección 16 de la Ley Núm. 21, *supra,* expresamente disponía como sigue:

> Los propietarios que no autorizaron expresamente el establecimiento del sistema de control de acceso no estarán obligados al pago de cuotas para el establecimiento, operación, mantenimiento o remoción de dicho sistema excepto en aquellos casos en que se comprometan a dichos pagos mediante contrato escrito. Cuando así se comprometan, estos propietarios estarán sujetos a las obligaciones y disposiciones de la Sección 10 de esta ley. Todo propietario o residente tendrá acceso al área sujeta al control de acceso en igualdad de condiciones y todo propietario podrá participar con voz y voto en las asambleas generales que celebre el Consejo, Junta o Asociación de Residentes, independientemente de que sea o no miembro de dicho organismo.

> 23 LPRA sec. 64g.

Cónsono con lo antes expuesto, bajo la vigencia de la Ley Núm. 21, *supra,* y en el escenario en el que el sistema de control de acceso hubiera sido implantado con posterioridad al funcionamiento de una urbanización no sujeta al mismo desde sus inicios, se reconoce el derecho de sus residentes a oponerse a la instalación correspondiente y, consecuentemente, a no pagar las cuotas aplicables. *Alonso Piñero v. Undare, Inc.* 199 DPR 32, 40-42 (2017); *Caquías v. Asoc. Res. Mansiones Río Piedras,* 134 DPR 181, 201 (1983). Sobre dicho particular, nuestro más Alto Foro se expresó como sigue:

> [...] [L]a obligación de pagar las cuotas mencionadas no se impuso a todo miembro de la comunidad, calle o urbanización que implantara tal régimen. Esa obligación no se atribuyó a aquellas personas que se opusieron a la implantación del sistema, es decir, a quienes no lo habían autorizado expresamente.

> *Alonso Piñero v. Undare, Inc.,* supra, págs. 40-41.

En este contexto particular, destacamos que el Artículo 3.015 del Código Municipal de Puerto Rico, Ley 107-2020, 21 LPRA sec. 7425, actual compilación legal que rige la materia del control de acceso y que derogó la precitada Ley Núm. 21, *supra,* dispone

que los propietarios que no autorizan expresamente el establecimiento de control de acceso, no están obligados a pagar las cuotas para su establecimiento, operación, mantenimiento o remoción, excepto se hayan comprometido mediante contrato escrito. Lo anterior, sin que vean limitado su derecho de acceso al área afecta por el sistema de control de acceso.

**III**

En la presente causa, la parte apelante, en esencia, plantea que el Tribunal de Primera Instancia erró al no determinar que la aquí apelada adquirió la titularidad de la unidad E-8 en disputa, mediante escritura de compraventa a los efectos suscrita en el año 2002. A tenor con ello, indica que el foro primario incidió al resolver que esta era dueña del referido inmueble desde el año 1985, que le asistía el derecho a oponerse a la instalación del sistema de control de acceso, y que esta no era una adquirente voluntaria sujeta al pago de las cuotas de mantenimiento acumuladas desde el año 2002 en la propiedad en disputa. Habiendo examinado los referidos planteamientos a la luz del derecho aplicable y los hechos establecidos, confirmamos la *Sentencia* apelada.

Un examen de los documentos que conforman el expediente de autos, particularmente de la transcripción de los procedimientos orales, mueve nuestro criterio a concluir que la determinación aquí impugnada, obedece a un correcto ejercicio de adjudicación judicial. Es nuestra postura que, tal cual lo resuelto por el foro sentenciador, la aquí apelada es la dueña de la propiedad E-8 de la Urbanización desde el año 1985, hecho que le arroga la potestad de oponer todas las prerrogativas que como tal le asisten, particularmente la relacionada a la exención del pago de la cuota de mantenimiento. Conforme se demostró, la entidad apelante carece de prueba que suprima el derecho invocado por la apelada, así como, también, de

evidencia suficiente que legitime los términos de su reclamación de cobro de dinero.

En principio, la parte apelante no aportó prueba alguna que sustentara sus argumentos en cuanto a que la apelada nunca ha sido reconocida como dueña del inmueble en cuestión. Si bien su contención radica en el hecho de que los padres de la apelada figuraban como titulares registrales de la unidad E-8, no fue capaz de probar que estos eran quienes realizaban actos efectivos de dominio en la Urbanización, ello por razón de carecer de constancia alguna que permita acreditar sus afirmaciones. Por el contrario, la prueba que aportó en cuanto al manejo y administración de la Urbanización, identifica a la apelada como la dueña de la unidad y ratifica la postura de esta en cuanto a que, desde que comenzó a ocupar la misma, no aportó al pago de las cuotas de mantenimiento, ello por legítimamente haberse opuesto a la instalación del sistema de control de acceso en el lugar.

Sobre este particular, también resulta forzoso concluir que la parte apelante tampoco pudo establecer la deuda que reclamó la apelada, ello partiendo desde el año 2002, cuando formalmente adquirió la titularidad registral de su residencia. La prueba testifical de la parte apelante no demostró la procedencia de las sumas alegadamente acumuladas y cuyo pago se imputó a la apelante. Tampoco pudo producir expediente alguno que reflejara la verdadera pendencia de algún pago atribuible a la unidad E-8 por el concepto en cuestión. Lejos de ello, la evidencia que produjo estableció que nunca hubo un cambio en la exención del pago de cuotas de mantenimiento que favorece a la apelada, que todas las facturas iban expresamente dirigidas a su persona y que era esta quien, públicamente, era reconocida como la dueña de la unidad E-8. Además, precisa destacar que, en su intento de prevalecer, la parte apelante aludió a facturas de cobro en cuanto a la apelada

que, según admitió la testigo Catillo Guzmán, eran inexistentes e incompatibles con lo que verdaderamente se reflejaba en los archivos de facturación de la Urbanización. En cuanto a este particular, trascribimos las afirmaciones de la testigo Castillo Guzmán al ser contrainterrogada:

> -P- Yo veo que ese documento contiene varias columnas, ¿correcto?
> -R- Correcto.
> -P- Bien. Y debo entender que el documento al final lo que contiene es un, digamos, resumen o ejercicio con la totalidad de las columnas, ¿correcto?
> -R- Correcto.
> -P- Bien. En la parte izquierda veo que dice: "Invoice", ¿correcto?
> -R- Correcto.
> -P- ¿La traducción de Invoice, es "factura"?
> -R- Correcto.
> -P- Y al lado tiene una... un número en la tercera columna, FC 56357, ¿cierto?
> -R- Correcto.
> -P- Y la fecha de la factura dice: "08/1/2022". Dos mil dos. Disculpe. ¿Correcto?
> -R- Correcto.
> -P- Pero lo cierto es que esa factura, FC 56357, usted no la hizo en esa fecha que dice ahí, ¿verdad que no?
> -R- Correcto.
> -P-Porque la factura que usted hizo en la fecha que dice ahí era en cero, ¿correcto?
> -R- Correcto.
> -P- Bien. Y lo cierto es que esa factura que menciona ahí no se le hizo llegar a la señora Rivera Sanfiorenzo, ¿verdad que no?
> -R-Correcto.
> -P-De hecho, no existe tal factura, FC 56357, ¿verdad que no?
> -R-Correcto.
> -P-"Correcto". Así que, usted hace alusión ahí a un número... a un sinnúmero de facturas que realmente, no son facturas que se hayan producidos, ¿verdad que no?
> -R- Correcto.[7]

A su vez, es menester aclarar que la parte apelante presentó en evidencia una declaración jurada en la que se daba fe de la alegada existencia de la deuda reclamada, la cual, según allí se indicó, procedía de la constancia en unos expedientes, cuyo contenido resultó no ser de conocimiento personal de quien la suscribió, a saber, de la testigo Seda Aponte. Al respecto,

---

[7] *Íd.* págs. 212-213.

transcribimos las expresiones pertinentes según vertidas en el contrainterrogatorio de la señora Seda Aponte:

[…]

-P Y debo entender, entonces, que la... el conocimiento o el fundamento o el cómputo o de dónde surge esta deuda que se menciona en su declaración jurada tampoco es injerencia suya, porque es la misma contestación, ¿correcto?
-R- Correcto.
-P- Es correcto. Así que, cuando usted hace esta declaración jurada no es un número que usted conoce, es un número que le pasó otra persona, ¿correcto?
-R- Correcto.
-P- Y cuál fue el cómputo que hizo esa persona y qué tomó en consideración, eso no es injerencia suya ni usted lo conoce, ¿verdad?
-R- Correcto.
-P- Muy bien. En el párrafo 9 de la declaración jurada...
[…]

[…].[8]

-P- Usted menciona ahí: "Según se desprende en los documentos que obran en los expedientes", ¿verdad?

-R- [No hubo respuesta verbal].
-P- ¿"Según los documentos que obran de los expedientes"?
-R- Unjú.
-P-Usted no miró ningún documento porque usted no tiene ningún expediente, ¿verdad que no?
-R- No, no tengo.
-P-Así que, cuando usted dice ahí, en el nueve: "Según los documentos que obran en el expediente", realmente eso no es verdad, porque usted no vio ningún documento en ningún expediente, ¿verdad que no?
-R- [No hubo respuesta verbal.]
-P- ¿Verdad que no?
-R- No.
-P- Muy bien. La verdad es que esta declaración jurada a usted se la prepararon y usted la firmó, ¿verdad que sí?
-R- Sí.
-P-¿Sí? Y ya nos ha dicho, que ni la cantidad ni los supuestos expedientes son cosas que corresponden a conocimiento personal suyo, ¿verdad que no?
-R- No, eso no.

[…].[9]

Ciertamente, dichas incidencias, las cuales, en efecto, minan la credibilidad de la prueba aportada, unido a la ausencia de prueba

---

[8] Véase: *Transcripción de Vista*, pág. 126.
[9] *Íd.*, págs. 127-128.

que estableciera un efectivo derecho de cobro a su favor, derrotan los argumentos de la parte apelante.

Por su parte, la apelada demostró que, desde el año 1985, era la legítima dueña de una unidad E-8, a quien se le dirigían las facturas de cobro y quien efectuaba toda gestión administrativa relacionada a la comunidad en la que reside. Esta fue capaz de explicar las condiciones de su adquisición inicial, así como, también, el hecho de que ejecutaba actos suficientes, públicos y reiterados que reflejaban sus derechos sobre el inmueble. En este sentido, presentó evidencia fehaciente de que, al momento de evaluarse la posibilidad de implementar el sistema de control de acceso, fue a ella a quien expresamente se dirigió la propuesta aplicable. Sobre la misma, la apelante demostró que fue quien expresamente se opuso al régimen en cuestión, redundando ello en quedar exenta de la obligación correspondiente, todo al presentar en evidencia copia del documento en el que expresamente se opuso. A su vez, la apelada demostró que participó activamente en un caso administrativo junto con otros residentes de su calle, todo en calidad de dueña y que, como tal, la Agencia concernida la reconoció. Por igual, también estableció que realizó mejoras y remodelaciones en su propiedad, hechos a los que dio publicidad, también en calidad de dueña, y los cuales fueron debidamente constatados por la parte apelada. Igualmente, la parte apelada también estableció las razones por las cuales formalizó sus derechos sobre el inmueble en el año 2002, así como las obligaciones que, en calidad de dueña, le asistían y con las cuales cabalmente cumplió.

Es premisa en nuestro ordenamiento jurídico que los derechos existen fuera del Registro de la Propiedad, sirviendo, este, solo para propósitos de publicar los mismos. El presente caso, afianza la oponibilidad de tal consigna. La apelante, desde el año 1985, era la dueña de la unidad E-8 en controversia, derecho que le fue

reconocido en la Urbanización por los entes que, desde entonces, fungieron en su administración. Esta se opuso a la instalación del sistema de control de acceso, quedando, así, exenta del pago de la cuota de mantenimiento, gracia cuyos efectos jurídicos también fueron observados en cuanto a su persona. La apelada era la persona respecto a la cual toda comunicación oficial de la Urbanización se dirigía, quien efectuaba actos concretos de dominio, quien públicamente participaba de actividades y convocatorias en calidad de dueña y contra quien ninguna deuda pudo probarse.

En mérito de todo lo anterior, toda vez que la parte apelante no demostró la existencia de deuda alguna en cuanto a la apelada, la cual, de haberse probado, ciertamente hubiese quedado sujeta a las normas de prescripción pertinentes, sostenemos el dictamen apelado en toda su extensión.

**IV**

Por los fundamentos que anteceden, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones